694 So.2d 793 (1997)
STATE of Florida, Appellant,
v.
Jerry BRIGHAM, Milan Krstec, John Paul Pobudinski, and Terrence Rolph, Appellees.
No. 96-01837.
District Court of Appeal of Florida, Second District.
May 7, 1997.
Rehearing Denied June 5, 1997.
Robert A. Butterworth, Attorney General, Tallahassee, and Dale E. Tarpley, Assistant Attorney General, Tampa; and Earl Moreland, State Attorney, Twelfth Judicial Circuit, and John M. Gillies, Assistant State Attorney, Sarasota, for Appellant.
Robert N. Harrison, Venice, for Appellees Brigham and Rolph.
Kerry E. Mack, Englewood, for Appellee Krstec.
David J. Migneault of Migneault & Wolfendale, P.A., Punta Gorda, for Appellee Pobudinski.
ALTENBERND, Acting Chief Judge.
The state appeals a nonfinal order granting a motion in limine in four consolidated county court DUI prosecutions. The order suppresses breath alcohol evidence provided by an Intoxilyzer 5000 breath test instrument and effectively requires the dismissal of all charges alleging a violation of section 316.193(1)(b), Florida Statutes (1995). The county court has certified several questions that require us to interpret the phrase, "breath alcohol level of 0.08 percent or higher" in section 316.193(1)(b).[1] We reverse the suppression orders. Although it may initially seem counter-intuitive because "percent" has a common definition for mathematical purposes, in this context it means "grams per 210 liters of breath."
In reaching our decision, we have considered not only the county court decision in this case but also several other county court decisions which the parties provided as persuasive authority. These decisions reach conflicting results. This court has been persuaded by the excellent opinion of Judge William A. Cooper, Jr., in State v. Wolfrom, No. 94-4-2808-TT (Fla. Bay County *794 Ct.1994). A copy of the relevant portions of that opinion is attached as Appendix A.

I. THE BASIC FACTUAL ALLEGATIONS IN THE FOUR CASES
All four cases are pending in Sarasota County Court on misdemeanor DUI charges. Mr. Jerry Brigham was arrested on Friday, July 21, 1995, at 5:45 p.m., for driving under the influence ("DUI"). His Intoxilyzer 5000 tests reported .227 and .225 grams of alcohol in 210 liters of breath. In addition to the breath test evidence, the probable cause affidavit reveals that the arresting officer observed erratic driving and other common indicators of intoxication.
Mr. Milan Krstec was arrested on Saturday, August 12, 1995, at 1 a.m. He was stopped because he was allegedly driving 76 mph in a 55 mph zone. When stopped, he admitted that he had consumed five beers. The standard sheriff's DUI report states that his breath test results were .098% and.097%.[2]
Mr. John Pobudinski was arrested on Friday, July 29, 1994, at 10 p.m. He was observed driving erratically by the arresting officer and failed a field sobriety test. Mr. Pobudinski's Intoxilyzer 5000 breath test results were. 238, .214, and .201.
Finally, Mr. Terrance Rolph was arrested on Thursday, October 19, 1995, at 11:30 p.m. He was stopped because he was allegedly driving 60 mph in a 35 mph zone and his car had only one operable headlight. The officer's probable cause affidavit reveals that Mr. Rolph admitted that he had been drinking beer and asked the officer to give him "a break." His three Intoxilyzer 5000 results were .143%, .168%, and .170%.

II. THE DEFENDANTS'"BREATH ALCOHOL" THEORY
The DUI statute proscribes the operation of a vehicle by a driver under two different, but interrelated, circumstances. First, it is illegal to operate a vehicle "under the influence of alcoholic beverages ... when affected to the extent that the person's normal faculties are impaired." § 316.193(1)(a), Fla.Stat. (1995). Second, it is illegal to operate a vehicle with "a blood or breath alcohol level of 0.08 percent or higher." § 316.193(1)(b), Fla.Stat. (1995). In each defendant's case, the record includes evidence the state could present in a subsection (a) "impairment" case. The defendants attempt to exclude evidence that would support a subsection (b) "percent" case. Because no blood tests were obtained from the defendants, the state must present proof of a "breath alcohol percent" to establish a subsection (b) violation.
Prior to 1991, section 316.193(1)(b) only prohibited the operation of a vehicle by a person with "a blood alcohol level of 0.10 percent or higher." § 316.193(1)(b), Fla. Stat. (1989). In 1991, the legislature amended that statute to add the concept of a "breath alcohol level of 0.10 percent." Ch. 91-255, § 1 at 2443, Laws of Fla. This concept was not changed when the permissible level of alcohol was reduced to 0.08% in 1993. Ch. 93-124, § 1 at 640, Laws of Fla. "Percent" is not defined in the statute. It is the absence of a statutory definition that fuels the defendants' argument.
All defendants argue that an Intoxilyzer 5000 breath test instrument actually measures grams of alcohol in a volume of breath. They reason that the ordinary definition of "percent" involves a mathematical equation of parts per one hundred. Webster New World College Dictionary 1002 (3d ed.1996). Under this ordinary definition, they believe that .227 grams of alcohol in 210 liters of breath equates to a breath alcohol percent of 0.000108. The trial court held that the common and ordinary meaning of "percent" requires the grams per liter measurement to be converted to the defendants' much smaller calculation.
As explained in this opinion, the defendants' theory contains a patent error in one of its assumptions. More important, it does not take into consideration some very practical information about the Intoxilyzer 5000 and the other breath test instruments in use *795 in 1991 and 1993 when the statute was amended.

III. THE INTOXILYZER 5000, HENRY'S LAW AND THE 1:2100 RATIO
In 1991 and 1993 when the legislature amended the DUI statute, the Intoxilyzer 5000 was an accepted breath testing machine in Florida. Fla Admin.Code R. 10D-42.024(3) (Mar.1993). This complex machine is actually a spectrophotometer that measures the absorption of infrared light by a sample of a gas. When a spectrophotometer is used as a breath test instrument, the sampled gas is human breath.
The absorption of infrared light by a sample of gas is affected by the concentration of alcohol in the gas. Once a sample's level of infrared light absorption is known, a physicist can calculate the concentration of alcohol in the sample of breath using a standard formula based on Beers Law or the Beer-Lambert Law. This standard formula determines the concentration in terms of the weight of the alcohol within the gaseous volume, i.e., grams per liter. See Paul Schop, Is DWI DOA?: Admissibility of Breath Testing Evidence in the Wake of Recent Challenges to Breath Testing Devices, 20 Sw. U.L.Rev. 247 (1991). The Intoxilyzer 5000 performs this calculation electronically and provides the results on a paper printout.
The level of alcohol in one's breath is dependent upon the level of alcohol in one's blood. Alcohol in human breath occurs due to the evaporation of alcohol in the lungs from the blood into the breath. The greater the blood alcohol concentration, the higher the breath alcohol concentration. The relationship between these two concentrations is derived by a formula that is an application of Henry's Law. Henry's Law states that, at a constant temperature, the concentration of a gas dissolved in a liquid is proportional to the concentration of that same gas in air directly above that liquid. See id. at 255-256.
When the level of alcohol in breath is compared to the level of alcohol in blood, there are differences among people. Nevertheless, by the early 1950s, the National Safety Council determined that under Henry's Law, for legal purposes, it is reasonable to assume that the weight of the alcohol present in one milliliter of any person's blood is equivalent to the weight of alcohol present in 2100 milliliters of that person's breath at 34 degrees centigrade. Peter Gerstenzang, How to Handle the DWI Case, The Breathalyzer 1993, at 69, 77 (PLI Litig. & Admin. Practice Course Handbook Series No. H 4-5182, 1993).
Despite the continuing scientific debate over the precision of the 1:2100 ratio, by 1991 it was widely accepted as an adequate equation for alcohol impairment statutes and testing machinery. Although the lawyers who defend DUI cases have long disputed the accuracy of this ratio, in 1990 a leading Florida defense treatise stated: "All breath instruments are calibrated on the assumption that the breath to blood ratio is 2100 to 1." Richard E. Jensen, Ph.D., DUI Defense: Tactics and Case Law, I-9 (Professional Education Systems 1990). An excellent law review discussion of the issue in 1991 states:
The universality of the 1:2,100 ratio is readily apparent. All breath testing devices currently on the National Highway Traffic Safety Administration's list of devices conforming to its model specification for breath testing equipment use this ratio. These model specifications are used as guidelines by states receiving federal money to purchase breath testing devices. The 1:2,100 ratio is also recognized by the Committee on Alcohol and Other Drugs of the National Safety Council as an accurate way to determine blood alcohol content.
In addition, the Uniform Vehicle Code now incorporates the 1:2,100 ratio into its per se definition of intoxication by defining alcohol concentration as either grams of alcohol per 100 milliliters of blood or grams of alcohol per 210 liters of breath. Fourteen states have adopted the definition of intoxication.
See Paul Schop, Is DWI DOA?: Admissibility of Breath Testing Evidence in the Wake of Recent Challenges to Breath Testing Devices, 20 Sw. U.L.Rev. 247, 256-257 (1991).
The Florida Legislature expressly adopted this assumption in the implied consent statute in 1991 in the same law that added the *796 "breath alcohol percentage": "The percent of alcohol in the blood shall be based upon grams of alcohol per 100 milliliters of blood when analyzing blood, or upon grams of alcohol per 210 liters of breath when analyzing breath." § 316.1932(1)(b)1., Fla.Stat. (Supp. 1992). Ch. 91-255, § 2 at 2447, Laws of Fla. As will be discussed later, neither of these weight to volume ratios is technically a mathematical "percent." "Percent" was used in this statute merely as a shorthand description of the formula.
As explained in Judge Cooper's opinion, the 1:2100 assumption was also made by the manufacturer of the Intoxilyzer 5000 in 1991 and 1993. As a result, the machine's printed test result is labeled a "percent." Both the legislature and any licensed driver who examined this complex machine in that period would have concluded that it measured breath alcohol as a "percent." The fact that this "percent" was actually a mathematical ratio based on grams of alcohol per 210 liters of breath, the same ratio contained in section 316.1932(1)(b), Florida Statutes (Supp.1992), would only have been obvious to an expert or to someone who took considerable time to learn about these machines.
Apparently because of the continuing national debate over the adequacy of the 1:2100 ratio, the manufacturer of the Intoxilyzer 5000 changed the printout in March 1994. Thereafter, the test result on newer machines was labeled "grams per 210 liters" rather than "percent." As Judge Cooper's opinion explains, the machine was not modified in any fashion other than to change the format of the test result. Once the Florida Legislature became aware that the readout had been changed from "percent" to "grams per 210 liters," it updated our statute. Ch. 96-330, § 3, at 1339 Fla. Session Law Serv. The statute no longer uses the word "percent," but continues to rely upon either grams of alcohol per 100 milliliters of blood or 1 gram of alcohol per 210 liters of breath. § 316.193(1), Fla.Stat. (Supp.1996).

IV. THE DEFENDANT'S ERRONEOUS CALCULATIONS RESULT IN AN ABSURD INTERPRETATION OF THE STATUTE
In the trial court, the defendants avoided a technical explanation of the Intoxilyzer 5000 and the 1:2100 ratio. They did not present testimony from a physicist, a toxicologist, or a doctor to explain this machinery. Instead, they called a high school math instructor, who performed some basic mathematical calculations in each of these cases using certain assumptions provided by the lawyers. He was asked to assume, for example, that .227 grams of alcohol in 210 liters equal .227 milliliters of alcohol in 210,000 milliliters of breath. Based on this assumption, a blood alcohol percent of .227 was equivalent to a breath alcohol percent of .000108. This is the "common and ordinary" interpretation adopted by the county court.
There are two basic problems with this interpretation. First, a mathematical percentage, as employed by a high school math instructor, is a formula that compares two quantities based on a common trait or unit of measurement. For example, one can measure the percentage of rotten apples in a box of apples based on: (1) the number of rotten apples compared to the total number of apples; (2) the weight of the rotten apples to the weight of all apples; or (3) the volume of the rotten apples to the overall volume. One can compare the weight of the rotten apples to the overall volume of apples, but this weight-to-volume ratio is not a mathematical percentage because it mixes units. Likewise, one can also obtain a ratio comparing 5 apples in a box of 50 oranges, but the ratio cannot be expressed as a percent of either apples or oranges. In this case, by assuming that the weight of the alcohol could be equated to its volume, the lawyers asked the math instructor to compare the volume of the alcohol reduced to its liquid state to the volume of the remaining breath in its gaseous state.[3] *797 The lawyers' assumption resulted in a liquidto-gas comparison that is essentially an apples-to-oranges "percent." It is incorrect as a matter of high school physics or chemistry without regard to high school mathematics.
Second, the flawed assumption dramatically shifts the results. Assuming that human breath would not be saturated with alcohol well before a 0.08% as calculated under the defendants' theory, it would clearly take a lethal dose of alcohol, apparently hundreds of times higher than these defendants' levels, to reach a breath alcohol level that violated the statute according to the defendants. Given that the legislature unquestionably intended to equate the breath alcohol level with a relatively low 0.08% blood alcohol level, there can be no dispute that the legislature did not intend the defendants'"common and ordinary" definition. The definition accepted by the trial court leads to an absurd interpretation of the statute. Even if this were a proper literal interpretation of the statute, there is no requirement that such a literal interpretation of the statute be utilized when that interpretation reaches an absurd result. Parker v. State, 406 So.2d 1089 (Fla.1981); State v. Webb, 398 So.2d 820 (Fla.1981).

V. IN CONTEXT, "PERCENT" MEANS GRAMS PER 210 LITERS OF BREATH
If a statute is so well written that it clearly and unambiguously conveys a definite meaning, there is no need to resort to statutory interpretation and construction. The judiciary must conclude that the legislature intended the result the statute conveys with its plain and obvious meaning. Holly v. Auld, 450 So.2d 217 (Fla.1984). This is not a rule of grammar; it reflects the constitutional obligation of the judiciary to respect the separate powers of the legislature. That same respect, however, requires the judiciary to fulfill the legislative purpose of an ambiguous statute when that purpose is adequately demonstrated in the text of the statute and in those reliable sources extrinsic to the text traditionally used to determine the legislature's purpose. See State v. Iacovone, 660 So.2d 1371 (Fla.1995).
There can be no dispute that the legislature's unusual definition of "percent" is not a common dictionary definition. This is perhaps an appropriate case in which to remind ourselves of Learned Hand's famous observation that a "mature and developed jurisprudence" does not "make a fortress out of the dictionary." Cabell v. Markham, 148 F.2d 737, 739 (2d Cir.1945). In determining the "plain and obvious" meaning of an overall statute, it is not always sufficient to examine only the first definition of the individual statutory words in the dictionary.
Beginning with the immediate text of section 316.193(1)(b), two things are clear. First, the legislature has not provided the units of comparison for either the blood or the breath alcohol "percent." The formula to determine this "percent" must be derived from some other source. Second, the legislature has decided that the formula used to measure blood alcohol and breath alcohol reach equivalent percentages.
Because we must look outside the text of the statute to define the formula for "percent," it is reasonable to examine the definition in section 316.1932(1)(b), the implied consent law, which is a statute in pari materia. See Harrington & Co. v. Tampa Port Auth., 358 So.2d 168 (Fla.1978). The fact that this definition was created in the same enactment as the original breath alcohol percent clause assures us that the two provisions were reviewed together and voted upon at the same time in the legislature. It is a definition that does equate blood alcohol and breath alcohol percentages. Under these circumstances, use of the related definition appears far more reasonable than reliance upon an unworkable mathematical definition. This is particularly true where the 1996 amendment to section 316.193(1) did not change the legislature's intended policy, but clarified its decision to rely on a breath alcohol test measured in grams per 210 liters of breath. See Palma Del Mar Condominium Ass'n v. Commercial Laundries, 586 So.2d *798 315 (Fla.1991)(court may consider clarifying amendment when interpreting original enactment); Ivey v. Chicago Ins. Co., 410 So.2d 494 (Fla.1982) (same).
It is fair to test our reliance upon this related statutory definition by examining the historical context in which the statute was enacted. From reviewing the legal treatises at the time of the enactment and the related technical information on breath test instruments, it is clear that both lawyers and manufacturers of breath test instruments referred to the test result as a "percent," even though it technically was a measurement of grams per 210 liters. This definition was employed on the printout of the Intoxilyzer 5000 and was commonly used on all other breath test instruments at that time. While this historic information might not justify overriding a common definition when that definition provided a workable statute, it does justify reliance on the adjacent statutory definition in this situation.
We recognize that a criminal statute must be given a strict construction in favor of the defendant. We are not required, however, to interpret the statute "so strictly as to emasculate the statute and defeat the obvious intention of the legislature." State ex rel. Washington v. Rivkind, 350 So.2d 575, 577 (Fla. 3d DCA 1977). This is not a statute in which the word "percent" is ambiguous in the sense that it has two competing definitions, leaving the defendant to guess at the appropriate meaning. The mathematical definition of "percent" provides these defendants with no reasonable interpretation of the statute. Although we respect the intelligence of the typical Florida driver, we are confident that his or her understanding of this statute and the related sophisticated test instrument in 1991 and 1993 would have been no greater than our own. To accomplish the statutory test, this electronic black box printed out a breath alcohol "percent" after a person breathed into it. To avoid a conviction under the "percent" statute, a driver would need to be very cautious about choosing to drive after drinking any significant amount of alcohol.

VI. CONCLUSION
The order granting the motion in limine in these four consolidated county court DUI prosecutions is reversed. The cases are remanded for trial. At trial, the phrase "breath alcohol level of 0.08 percent or higher" shall be interpreted to mean "breath alcohol level of 0.08 grams per 210 liters of breath or higher."
Reversed and remanded.
BLUE and FULMER, JJ., concur.
 APPENDIX A
 IN THE COUNTY COURT, IN AND
 FOR BAY COUNTY, FLORIDA
STATE OF FLORIDA
c/o MARK E. GRAHAM, ESQ.
State Attorney's Office
 Plaintiff,
vs.
JAMES TODD WOLFROM
c/o JAMES H. WHITE, ESQ.
229 McKenzie Avenue
Panama City, FL 32401
 Defendant.
CASE NO. 94-4-2808-TT
STATE OF FLORIDA
c/o MARK E. GRAHAM, ESQ.
State Attorney's Office
 Plaintiff,
vs.
MARK ALLEN AARON
c/o JAMES H. WHITE, ESQ.
229 McKenzie Avenue
Panama City, FL 32401
 Defendant.
CASE NO. 94-4-3300-TT

ORDER ON MOTIONS
These defendants have filed a joint motion seeking to have suppressed their respective "intoxilyzer" readings. The motion is based upon three arguments, two of which were *799 argued at the hearing with the remaining argument to be made at another hearing if the motion is denied on the basis of these two. The first argument is that because the applicable statute (Section 316.193(1)(b), Florida Statutes (1993)) proscribes driving with a blood or breath alcohol level of 0.08% or higher and the Intoxilyzer 5000 renders its results in terms of weight per unit of volume (grams per 210 liters) rather than a percentage, the results are not relevant and are confusing and misleading. The second argument is that each defendant gave consent to "an approved chemical test of his breath for the purpose of determining the alcoholic content of his blood," but in fact the test given did not determine the alcoholic content of his blood. It determined the alcoholic content of his breath. Therefore neither defendant's consent to the breath test was voluntary.

Stipulated Facts
In addition to the sworn testimony of the State's expert witness, the parties agreed to the following facts:
1. On or about March 10, 1994, the Intoxilyzer 5000 machine used in these cases was modified to produce evidence of breath alcohol instead of blood alcohol. This was accomplished by the installation of a computer chip, called "E-Prom," which caused the results to read in terms of "grams per 210 liters" rather than "% blood alcohol content." The installation of this chip changed only one aspect of the machine's function, its printout.
2. The Intoxilyzer 5000 machine measures only breath alcohol and renders its results in terms of "grams per 210 liters" (weight per volume). It cannot render results in terms of "% blood alcohol content" (the percent of alcohol in the blood), although prior to the E-prom chip installation that is exactly what it purported to do.
3. The FDLE form provided for use with each defendant for the purpose of recording the test results (Form 14), as well as the respective evidence cards printed out by the machine after each test, both express the test results in terms of the weight in grams of alcohol in the breath ("G/210L").
4. The implied consent warning read to each defendant and used to obtain the consent of each defendant to provide a breath sample stated that each defendant was giving his consent to submit to an approved chemical test of his breath for the purpose of determining the alcoholic content of his blood.

Testimony
The only other evidence presented at the hearing was the testimony by telephone of Dr. Mark Montgomery, recognized as an expert in the field of biochemical toxicology. Dr. Montgomery agreed that the Intoxilyzer measures the weight of alcohol (measured in grams) in a given volume of breath (measured in liters). This result should never be expressed as a percentage, since, under normal scientific nomenclature, a percentage is the portion of one thing that belongs to another measurement of the same thing and it is based upon 100. Thus, grams as a part of liters should not be expressed as a percentage, since it is not two measurements of the same thing and it is not based upon 100 when the measurement is grams per 210 liters. The proper expression is "proportion," rather than "percentage." Mass can be a percentage of another mass; it cannot be a percentage of volume. It can be expressed as a proportion of volume. He agreed that 0.08 grams/210 liters is not the same expression or value as 0.08% blood alcohol concentration, if one is using conventional scientific terms, simply because 0.08% BAC would have no scientific meaning (attempting to express grams of alcohol as a percentage of 100 ml of blood). However, he allowed that the term BAC could be recognized and accepted by non-scientific types, as long as it had a definite meaning among a given group.

I. Should Intoxilyzer test results be suppressed as irrelevant?
Wolfrom is charged by information with driving while having an unlawful breath alcohol level of 0.08 grams per 210 liters or above, and Aaron is charged by information with driving while having an unlawful blood or breath alcohol level of .08 percent or above, both in violation of Section 316.193, Florida Statutes (1993). Section *800 316.193(1)(b) makes unlawful driving a vehicle in Florida while having "a blood or breath alcohol level of 0.08 percent or higher." Defendant Aaron is therefore charged by information with violation of the statute. Defendant Wolfrom, on the other hand, is charged by information with driving with a breath alcohol level of 0.08 grams per 210 liters or above. In Wolfrom's case, then, it can hardly be argued that the machine evidence expressed in terms of grams per 210 liters of breath is irrelevant, since that is exactly what Wolfrom is charged with. I will therefore treat the motion to suppress in Wolfrom's case as a motion to dismiss for failure to charge a crime. State v. Gray, 435 So.2d 816 (Fla.1983). In either Wolfrom or Aaron the issue remains whether evidence that a suspect's breath alcohol level was greater than 0.08 grams of alcohol per 210 liters of breath, as provided by the Intoxilyzer 5000, is relevant to proving that person violated Section 316.193(1)(b). This is the issue in Wolfrom because the State maintains that having a breath alcohol level of 0.08 grams per 210 liters is the equivalent of having a breath alcohol level of 0.08 percent, despite the State's own expert witness' agreement with the defense that the two terms are not the same (since one term has meaning and one does not).
The statute provides a crucial addition that must be taken into account when evaluating its meaning. This is found in Section 316.1932(1)(b)1.:
(b)1. The percent of alcohol in the blood shall be based upon grams of alcohol per 100 milliliters of blood when analyzing blood, or upon grams of alcohol per 210 liters of breath when analyzing breath.
The procedure I shall use in analyzing whether or not the expressions "0.08 grams per 210 liters of breath" and "blood or breath alcohol level of 0.08 percent or higher" are equivalent is as follows. I will first interpret the plain meaning of each expression, if one is to be found. In the absence of a plain meaning, I will resort to principles of statutory construction to determine meaning. Once meanings have been identified, the expressions can be evaluated to see if they are equivalent.

"Grams of alcohol per 210 liters of breath"
This expression is very straightforward, and no one has argued that its meaning is unclear. The Intoxilyzer 5000 performs its function by weighing the amount of alcohol in the breath sample provided by the suspect and converts that weight by extrapolation to the corresponding weight for 210 liters of breath.

"Breath alcohol level of 0.08 percent or higher"
We are told by the section reproduced above that the percent of alcohol in the blood is based upon grams of alcohol per 210 liters of breath when analyzing breath. This would seem to indicate that some mathematical operation should be performed upon the results, rendered in terms of grams per 210 liters, in order to convert that result into a percentage of alcohol in the blood. If the legislature had chosen to use the phrase "expressed as" instead of "based upon," in Section 316.1932(1)(b) 1., this inquiry would be finished, since that definition, even if not acceptable in scientific circles, would suffice to foreclose any question of ambiguity or relevance. It did not, however, and we are left to determine what "percent" may be derived from a result expressed in terms of grams per 210 liters.
The term "percent" is derived from the French/Latin term "per centum" meaning "of each hundred." It means "a part of a hundred," or "reckoned on the basis of a whole divided into a hundred parts." Webster's Third New International Dictionary 1675 (1st ed. unabridged 1970). A percent, then, is one one-hundredth part. The Random House Dictionary of the English Language 1069 (1st ed. unabridged 1967). If one wishes to express his observation that a glass is half full of water he might say that it is "50% full." If the volume of the glass is 100 cubic centimeters, he is saying that the water occupies 50 cubic centimeters of that 100. Since we are dealing with parts of a whole, we don't care how much the water weighs. If it weighed 130 grams, we would *801 not say that the percentage of water is 1.3 grams per cubic centimeter or 1.3 percent. If the volume of the container was expressed in liters (liquid volume) and the total volume just happened to be 210 liters, the weight of something mixed in among the 210 liters would not be expressed as a percentage of the 210 liters. If one decided to ignore scientific convention and express the weight of alcohol as a percentage of 210 liters of breath, he would still have to divide by 210, then multiply by 100 to obtain a "percentage," since all percentages have to be based upon 100. Thus, a reading of 0.08 grams per 210 liters would become 0.038 percent (0.08 divided by 210 times 100). Expressing apples as a percentage of oranges, although really meaningless, may appear to have significance when the denominator is 100 of something. Thus, grams per 100 milliliters of blood would not require a conversion to reach a "percentage," since dividing by 100, then multiplying by 100 yields the same result as multiplying by 1. We could thus say 0.08 percent blood alcohol content is "the same as" 0.08 grams per 100 milliliters of blood, although in reality it is not (since one term has meaning and the other does not). This is in fact what has been done for decades under Florida law. The breath testing equipment dutifully reported "% BAL" as it was programmed to do, and no one thought to question how the weight of something could possibly be a percentage of the volume of something. However, the new defense tactic of challenging the "blood to breath ratio" caused all this to change.
From the testimonies of many prior experts in various DUI cases, I have learned that all breath testing equipment is based upon an assumption that the weight of alcohol in a given volume of blood will be approximately 2100 times greater than the weight of alcohol in the same volume of that person's breath. Thus, the weight of alcohol in 100 milliliters of blood would be 2100 times greater than the weight of alcohol in 100 milliliters of breath. The weight of alcohol in 100 milliliters of blood would then equal the weight of alcohol in 210 liters (100 ml times 2100) of breath. Experts testified that what the machine was really weighing was the weight of alcohol in a known volume of breath sample and converting that to the extrapolated weight for 210 liters of breath. Defense lawyers, however, began to challenge the 2100:1 ratio, because of evidence that it is not the same for all people, and even though it is very close for the vast majority of people, all the defense lawyer needs is an opportunity to argue reasonable doubt. It wasn't long before defense counsel began arguing the shortcomings of the blood to breath ratio assumption to juries, with predictable results. To counter this, the legislature added Section 316.1932(1)(b) 1., Florida Statutes (1991) and added the words "or breath" to Section 316.193(1)(b). Ch. 91-255, sections 1 & 2, Laws of Fla. Since it now became a violation of Florida law to drive with an unlawful breath alcohol content, it was possible to circumvent the "assumption" argument, since the assumption had been made law. Also, the breath testing equipment was modified to more accurately reflect the true results of its measurements by the installation of the "E-prom" chip, causing the readout to be changed from "¿L" to "G/ 210L." It was this change, however, that alerted hungry defense lawyers that something was not right. After all, how can you just change a percent to weight per volume? If the chip changed nothing about the operation of the machine, which reading was correct, the one rendered for so many years, or the new one? Thus, the problem that had been silently lurking in the DUI statute became illuminated.
Hopefully, I have demonstrated that the term "breath alcohol level of 0.08% or higher" has no (literal) meaning, because of the word "percent." Therefore, it cannot be equivalent to the expression "grams of alcohol per 210 liters of breath." Since the two terms, given their plain meaning, are not equivalent, I will next consider principles of statutory interpretation to conclude whether the defendants' motions ought to be granted. In other words, can the two expressions be interpreted to be equivalent? If not, the breath test results should be suppressed as irrelevant in Aaron and the information dismissed as not charging a crime in Wolfrom.

*802 The law of statutory construction

In Parker v. State, 406 So.2d 1089 (Fla. 1981), the supreme court was asked to construe Section 893.13, Florida Statutes (1977) to determine whether or not possession of more than 100 pounds of marijuana was a third degree felony or a second degree felony. The statute stated that anyone who sells, manufactures, delivers or possesses with the intent to sell, manufacture or deliver cannabis is guilty of a third degree felony, except that the sale, delivery or possession of more than 100 pounds of cannabis is a second degree felony. Although the statute did not literally say so, defendant argued that it ought to be construed to add the element of intent to possession of more than 100 pounds; he was charged with mere possession of more than 100 pounds of cannabis, and there was no evidence of intent to sell, manufacture or deliver. The court did not consider itself called upon to depart from the literal meaning of the statute, but it acknowledged that such a departure is permitted when "... a literal interpretation would lead to an illogical result or one not intended by the lawmakers." Id. at 1091 (citation omitted). It noted that "... legislative intent is the pole star by which we must be guided in interpreting the provisions of a law." Id. at 1092 (citation omitted).
When a literal interpretation of a statute would result in an absurd result, the courts have recognized this as an exception to the rule that courts are not at liberty to define the elements of a crime in terms different from those the legislature used. In State v. Perez, 531 So.2d 961 (Fla.1988), the supreme court was concerned with the meaning of another section of the DUI statute, Section 316.1933(1), Florida Statutes (1985). This section dealt with the conditions under which a DUI suspect could be required to submit to a blood test, even over his objection, one condition of which was that the driver had "... caused the death or serious bodily injury of a human being." The issue was whether that language was meant to include the impaired driver who injures only himself. A literal interpretation of the statute would necessitate the conclusion that it did include the impaired driver, since he would be (at least in most cases) a "human being." The court reasoned, however, that such an interpretation would be illogical, taking into account both the exact wording of the statute and the entire statutory scheme. It had no problem interpreting the language to exclude the driver in light of the other provisions in the DUI law, as well as the stated legislative intent and other clarifying language contained in various legislative revisions.
Likewise, in Williams v. State, 492 So.2d 1051 (Fla.1986), the supreme court refused to adopt the literal meaning of a statute when such action would result in a totally unintended result. In that case the court reviewed a decision by our First District Court of Appeal Williams v. State, 468 So.2d 447 (Fla. 1st DCA [1985]) which upheld the defendant's conviction of Section 790.23, Florida Statutes (1985) dealing with possession of a firearm by a convicted felon. One of the defendant's points was that the trial judge erred in finding that the weapon he had used in the crime was a "firearm" as defined by the statute. The statute prohibits a convicted felon from possessing a firearm unless it is an antique or a replica of an antique. Defendant claimed that his weapon had to fall into one of those two categories. Justice Adkins, writing for a unanimous court on this point, rejected that claim:
Williams would have us construe the antique "or replica" exceptions of section 790.23 in such a way as to condone the concealment, by a convicted felon, of a firearm which may possibly be a replica of an antique, but is obviously operable and loaded with live ammunition. We do not believe that the legislature, when enacting section 790.23, intended that a convicted felon could be acquitted when possessing a concealed, loaded weapon by using the excuse that the weapon is an antique or a replica thereof. This literal requirement of the statute exalts form over substance to the detriment of public policy, and such a result is clearly absurd. It is a basic tenet of statutory construction that statutes will not be interpreted so as to yield an absurd result. (Citations omitted)(emphasis added).
*803 492 So.2d at 1054
The effect of this decision was to add the term "non-functional" or its equivalent to the statute, so as to accomplish the court's perception of what the legislature intended.
Defendants cite a line of cases which stand for the proposition, well-settled in Florida law, that penal statutes must be strictly construed, ambiguities should be resolved in favor of defendants, and courts may not substitute definitions of crimes not found in the statutes. See State v. Graydon, 506 So.2d 393 (Fla.1987), and Jackson v. State, 515 So.2d 394 (Fla. 1st DCA 1987). However, it is clear to me that any construction of a statute which renders absurd and unintended results is to be avoided at all costs. "Undoubtedly penal statutes must be strictly construed. However, they must not be construed so strictly as to emasculate the statute and defeat the obvious intention of the legislature." Martin v. State, 367 So.2d 1119 (Fla. 1st DCA 1979).
One need not consult legislative analyses or trace the legislative history of Section 316.193 in order to know what the legislature intended. It quite clearly intended to make unlawful one's driving a vehicle in Florida with a "blood alcohol level" of 0.08 grams of alcohol per 100 milliliters of blood or greater, or a "breath alcohol level" of 0.08 grams of alcohol per 210 liters of breath or greater. The fact that the word "percent" is erroneously used does not, in my opinion, render the act void or even confusing. For years, none of us was "confused" until some bright soul figured out that "percent" was an improper scientific term to use in this context. It does not require an inappropriate degree of legal legerdemain to substitute the term "expressed as" for "based upon" in Section 316.1932(1)(b) 1., which would have the effect of defining "percent" in a new, but now consistent, way, especially when one considers that the results of granting defendants' motions, if upheld on appeal, would be to create chaos across the state and perhaps mandate an emergency session of the legislature. I believe that this expression ("expressed as") is what the legislature really intended to say, and I therefore conclude that the expression "X grams per 210 liters" is the equivalent of "X% BAL," and defendants' motions to suppress the breath test results as irrelevant (or dismiss the information as not charging a crime) should be denied.
NOTES
[1] The parties do not contest our jurisdiction. The state's notice of appeal claimed that the order declared the relevant statute unconstitutional. In fact, the order upholds the constitutionality of the statute by providing a definition of "percent." We conclude, however, that the order does suppress evidence and is appealable on that basis. State v. Slaney, 653 So.2d 422 (Fla. [3d DCA] 1995); Fla.R.App.P. 9.030(b)(4)(B). We have reviewed State v. Boyd, 610 So.2d 64 (Fla. 1st DCA 1992), and State v. Kepke, 596 So.2d 715 (Fla. 4th DCA 1992), and conclude that they are distinguishable. Using the legal definition of "percent" announced by the trial court, the defendant's breath tests cannot possibly be admitted to prove a violation of section 316.193(1)(b).
[2] In this statement of the facts, we intentionally describe the test results using the formats employed in the records. An Intoxilyzer 5000 breath test instrument was used in all cases.
[3] As the state's toxicologist in this case tried to explain, this assumption is incorrect even when one is working with liquid alcohol. One milliliter of water weighs one gram. Alcohol is lighter than water. More important, the assumption that the lawyers asked the math instructor to make is comparable to comparing one milliliter of water with 210 liters of steam. A volume of steam, however, at normal pressure is far lighter than a comparable volume of water. It is this shift from gas to liquid that caused the dramatic reduction in the size of the defendants' proposed "percent."