Mark SALES, Appellant–Cross–Appellee–Defendant,

v.

STATE of Indiana, Appellee–Cross–Appellant–Plaintiff.

No. 08A02–9806–CR–515.

Court of Appeals of Indiana.

July 7, 1999.

Nicholas C. Deets, Heide Sandy Deets & Kennedy, Lafayette, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Janet Brown Mallett, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

NAJAM, Judge

### STATEMENT OF THE CASE

Mark Sales brings this permissive interlocutory appeal pursuant to Indiana Appellate Rule 4(B)(6) from the trial court's denial of his motion to suppress. The State charged Sales with three counts of operating a vehicle while intoxicated, as Class C and Class A misdemeanors. Sales filed a motion to suppress which alleged that the results of his Intoxilyzer 5000 breath test are inadmissible as evidence because the instrument used to

conduct the test does not meet the selection criteria established by the Department of Toxicology under Title 260, Rule 1.1–5–1(a)(1) of the Indiana Administrative Code. The State cross-appeals and argues that the trial court erred when it held that the elements required for a conviction under Indiana Code Section 9–30–5–1(a)(2) are "physically and medically" impossible and dismissed the count based on that provision.

We affirm.[1]

## ISSUES

The parties present two issues for review:

1. Whether the trial court abused its discretion when it denied Sales' motion to suppress the results of his Intoxilyzer 5000 breath test.

2. Whether the trial court erred when it dismissed *sua sponte* the charge against Sales based on the breath-alcohol provision in Indiana Code Section 9–30–5–1.

## FACTS AND PROCEDURAL HISTORY

On January 10, 1998, Delphi Police Officer Paul Vondrasek stopped Mark Sales when he failed to yield the right-of-way. After the stop, Officer Vondrasek administered a breath test to Sales on an Intoxilyzer 5000 machine. The printout of the breath test showed ".14 grams of alcohol per 210 liters of breath." The State then charged Sales with operating a vehicle while intoxicated under Indiana Code Section 9–30–5–2.

In April, Sales filed a motion to suppress the results of the breath test administered by Officer Vondrasek. On the same day, the State filed two additional charges against Sales: Count II, operating a vehicle with .10 percent or more by weight of alcohol in his blood; and Count III, operating a vehicle with at least .10 percent of alcohol by weight

in his breath.[2] The court denied Sales' motion to suppress and issued an order in which it dismissed Count III. Specifically, the court determined that the elements required for a conviction under Indiana Code Section 9–30–5–1(a)(2) are "physically and medically impossible." [3]

Thereafter, both parties filed petitions for certification of the court's order for interlocutory appeal. In May of 1998, the trial court amended its original order and certified both orders. Sales appealed and the State cross-appealed.

## DISCUSSION AND DECISION

### Issue One: Admissibility of Intoxilyzer 5000 Results

■ Sales argues that the trial court erred when it denied his motion to suppress the results of his breath test. In general, Sales asserts that the Intoxilyzer 5000 printout of his test results is inadmissible under Indiana Code Section 9–30–6–5 (hereinafter "Section 5"), the statute which governs the admissibility of breath test results. Specifically, Sales contends that his test results do not comply with Title 260, Rule 1.1–5–1(a)(1) of the Indiana Administrative Code, a rule promulgated pursuant to Section 5. The State counters that the results of Sales' breath test are admissible because there is no evidence that the test itself was unreliable. We address the arguments in turn.

■ Generally, we review the denial of a motion to suppress in a manner similar to other sufficiency matters. *Taylor v. State*, 689 N.E.2d 699, 702 (Ind.1997). We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Id.* The suppression issue in this case, however, involves a question of law.

---

1. We heard oral argument in this case on April 23, 1999.

2. *See* Ind.Code § 9–30–5–1(a)(1)–(2).

3. Indiana Code Section 9–30–5–1(a)(2) provides that a person who operates a vehicle with at least ten-hundredths percent (.10%) of alcohol by weight in grams in two hundred ten (210) liters of the person's breath commits a Class C misdemeanor.

Attached to the trial court's original order was a seven-page document entitled "Rationale of the Court," in which the court explained, using mathematical formulas, how it had reached the conclusion that the elements required for a conviction under Indiana Code Section 9–30–5–1(a)(2) are physically and medically impossible. We commend the court for the calculations and commentary which explain its order.

Where the issue presented on appeal is a pure question of law, we review the matter *de novo*. *State v. Moss–Dwyer*, 686 N.E.2d 109, 110 (Ind.1997).

Section 5 of Indiana's breath test admissibility statute provides in relevant part:

(a) The director of the department of toxicology of the Indiana University school of medicine shall adopt rules under IC 4–22–2 concerning the following:

(1) Standards and regulations for the:

(A) selection;

(B) training; and

(C) certification;

of breath test operators.

(2) Standards and regulations for the:

(A) selection; and

(B) certification;

of breath test equipment and chemicals.

\* \* \* \* \*

(d) Results of chemical tests that involve an analysis of a person's breath are not admissible in a proceeding under this chapter, IC 9–30–5, IC 9–30–9, or IC 9–30–15 if:

(1) the test operator;

(2) the test equipment;

(3) the chemicals used in the test, if any; or

(4) the techniques used in the test;

have not been approved in accordance with the rules adopted under subsection (a).

Subsequent to the enactment of Section 5, the Department of Toxicology, as directed by our legislature, promulgated administrative rules concerning the standards and regulations for the selection and certification of breath test equipment. *See* IND. ADMIN. CODE tit. 260, r. 1.1–2–1 through 1.1–2–3; IND. ADMIN. CODE tit. 260, r. 1.1–5–1. In particular, Rule 1.1–5–1 requires that all breath test instrument models be selected by the director of the state Department of Toxicology of the Indiana University School of Medicine prior to their evidentiary use. Additionally, the rule in effect when Sales was tested stated that "[t]he instrument must analyze breath samples and the numerical blood alcohol concentration value it reports *shall be in units of percent by weight (eight/volume) of alcohol in blood.*" IND. ADMIN. CODE tit. 260, r. 1.1–5–1(a)(1) (emphasis added).[4]

In March of 1994, the manufacturer of the Intoxilyzer 5000 changed the unit of measurement reported on the machine's printout from "percent" to "grams per 210 liters." *State v. Brigham*, 694 So.2d 793, 796 (Fla.Ct. App.1997).[5] In this case, Sales' breath test was performed on an Intoxilyzer 5000 machine which reported a value of .14, and the printout contained the following statement: "Alcohol readings are expressed as grams of alcohol per 210 liters of breath." Because the result of his breath test was reported *in grams of alcohol per 210 liters of breath* rather than *in units of percent by weight of alcohol in blood*, as required by Rule 1.1–5–1(a)(1), Sales maintains that the Intoxilyzer 5000 results are inadmissible.

In support of his argument, Sales relies on *Crouch v. State*, 638 N.E.2d 861 (Ind.Ct.App. 1994). In that case, Crouch moved to suppress the results of his breath test which was administered *before* the Department of Toxicology had promulgated administrative regulations pursuant to Section 5. On review, this court reversed the trial court's ruling on the admissibility of the breath test results and vacated Crouch's conviction for operat-

4. On January 6, 1999, an amended version of Rule 1.1–5–1 became effective which provides: (1) The instrument must analyze breath samples and the numerical value it reports shall be expressed as *percent by weight of alcohol in one hundred (100) milliliters blood or grams of alcohol per two hundred ten (210) liters of breath.* 22 Ind. Reg. 976 (1998) (emphasis added).

5. As we discuss at length in Issue Two, *infra*, this change was the result of a nationwide debate over the accuracy of a long-standing assumption that the weight of alcohol present in one milliliter of any person's blood is equivalent to the weight of alcohol present in 2100 milliliters of that person's breath. *Brigham*, 694 So.2d at 795. It is important to note that the machine itself was not modified in any way, only the format of the test result. *Id.* at 796. In fact, although prior to 1994 the machine had reported results as a "percent," this "percent" was actually a mathematical ratio based on grams of alcohol per 210 liters of breath. *Id.*

ing a vehicle with a blood alcohol content of 0.10% or greater.

In so doing, we stated that "[o]ur courts have consistently held that the necessary foundation for admissibility of a breath test requires proof that the approved methods have been followed" and that "Section 5 and the rules adopted pursuant to that section require strict compliance with the approved method." *Id.* at 864. We held in *Crouch* that Section 5 requires the method used in administering a breath test to be approved by the Department of Toxicology *at the time* the test is administered. *Id.* (emphasis added).

In the wake of our *Crouch* decision, this court was presented with multiple challenges to the admissibility of breath test results which were administered before the Department of Toxicology promulgated specific standards for the *selection* of breath test equipment. *See, e.g., Storrjohann v. State,* 651 N.E.2d 294 (Ind.Ct.App.1995); *Key v. State,* 651 N.E.2d 1190 (Ind.Ct.App.1995); *State v. Hayes,* 655 N.E.2d 627 (Ind.Ct.App. 1995), *trans. denied.* The challenges in those cases differed from the challenge in *Crouch* in that Crouch's breath test was administered before the Department of Toxicology had promulgated Title 260 pursuant to Section 5, and the subsequent challenges were based on breath tests administered before the adoption of Rule 1.1–5–1, entitled "Selection Criteria." [6]

In *Key v. State,* we determined that "[t]here is no requirement in Indiana Code § 9–30–6–5(a)(2) that the Department [of Toxicology] list standards for the selection of breath test equipment *separately* from the standards pertaining to certification, inspec-

tion and operation of the same equipment." 651 N.E.2d at 1191 (emphasis added).[7] Stated differently, we reasoned that while Rule 1.1–5–1 provided useful clarification, it and the previously adopted Rule 1.1–2–1(e) are "essentially redundant insofar as selection criteria are concerned." *Id.* at 1192.[8]

We also emphasized "that the essential purpose of the statutory mandate that the Department of Toxicology adopt standards and regulations is 'to ensure the reliability and accuracy of the results of the test.'" *Id.* at 1192 (quoting *Crouch,* 638 N.E.2d at 864). Because Key asserted no challenge to the reliability or accuracy of his breath test, we concluded that Key's argument invited the court to elevate form over substance and that there was no evidence that Key's breath test results were unreliable. *Id.*

It was not until January 6, 1999, that the Department of Toxicology amended Rule 1.1–5–1(a)(1) to reflect the changes both in the per se operating while intoxicated statute, *see* Issue Two, *infra,* and the Intoxilyzer 5000's printout. *See* 22 Ind. Reg. 976 (1998) (to be codified at IND. ADMIN. CODE tit. 260, r. 1.1.5.1). As a result, for a period of approximately eighteen months, the value as shown on the printout was inconsistent with the regulations. Sales' breath test occurred within that eighteen-month period. Like the defendant in *Key,* however, Sales does not assert that his breath test was unreliable or inaccurate, and there is no evidence that the Intoxilyzer 5000 machine used in this case had not been selected and certified by the Department of Toxicology prior to use. Instead, Sales seeks suppression of his breath test results based on the fact that the machine's printout reported his blood alcohol

---

**6.** Rule 1.1–5–1 was adopted on August 30, 1994, and became effective thirty days later. 18 Ind. Reg. 11(1994).

**7.** Subsection (a)(2) of Section 5 requires the Department of Toxicology to adopt rules concerning standards and regulations for the *selection and certification* of breath test equipment and chemicals. IND CODE § 9–30–6–5(a)(2) (emphasis added).

**8.** Rule 1.1–2–1(e) provides:
Breath test equipment shall meet the following standards:

(1) Tests shall be made using a known ethanol-water or ethanol-gas solution to simulate an ethanol-breath solution.
(2) Such test results shall not deviate more than minus eight percent (–8%) from the known alcohol content of the ethanol-water or ethanol-gas test solution. [example omitted]. No test result for the purpose of certification shall exceed the known ethanol content of the test solution.
(3) For the purpose of inspecting the breath test equipment, the analytical result shall be expressed to the third decimal point.

content in a unit of measurement different from that prescribed under Rule 1.1–5–1(a)(1). Given our decision in *Key* that Section 5 does not require separate selection criteria and that the substance of Rule 1.1–5–1 is covered by Rule 1.1–2–1(e), we conclude that the printout of Sales' breath test is admissible. Sales, like Key, asks that we elevate form over substance. We hold that the trial court properly denied Sales' motion to suppress.

### Issue Two: Indiana Code Section 9–30–5–1(a)(2)

We next consider whether breath test results expressed in grams per 210 liters of breath can support a conviction under Indiana Code Section 9–30–5–1(a)(2) as written. In its cross-appeal, the State challenges the trial court's *sua sponte* dismissal of Count III of the information, which alleged that Sales operated a vehicle with at least .10% of alcohol by weight in grams in 210 liters of his breath. Sales counters that the legislature's inclusion of the term "percent" in the statute renders a conviction under the breath-alcohol provision impossible. Again, the question presented by the parties is a pure question of law which we review *de novo. Moss–Dwyer,* 686 N.E.2d at 110.

Prior to being amended, Indiana Code Section 9–30–5–1(a) provided: "A person who operates a vehicle with at least ten-hundredths percent (.10%) by weight of alcohol in the person's blood commits a Class C misdemeanor." In 1997, our legislature amended Indiana Code Section 9–30–5–1(a) to read as follows:

A person who operates a vehicle with at least *ten-hundredths percent (.10%) of alcohol by weight in grams in:*

(1) one hundred (100) milliliters of the person's blood; or

(2) *two hundred ten (210) liters of the person's breath;*

commits a Class C misdemeanor.

(Pub.L. No. 33–1997, Sec. 7) (emphases added). In its seven-page document entitled "Rationale of the Court," the trial court provided a cogent explanation of how the Intoxilyzer 5000 operates and why, according to the court, a conviction under the amended breath-alcohol provision is physically and medically impossible. The trial court stated in relevant part:

The Intoxilyzer 5000 and other similar instruments for determining blood alcohol content measure alcohol in the breath and then calculate the amount of alcohol in the blood by using a conversion factor. The conversion factor is based upon scientific studies which have found that the alcohol/blood ratio [is] approximately 2100 times greater than the concentration of alcohol found in the breath. An instrument such as the Intoxilyzer 5000 measures the concentration of alcohol in the breath and then multiplies by 2100 to determine the concentration of alcohol in the person's blood.

Prior to the 1997 amendment of IC 9–30–5–1, a person committed a Class C misdemeanor by operating a vehicle with 0.10% of alcohol by weight of alcohol in the person's blood. *The instrument used (Intoxilyzer 5000) measured the amount of alcohol in the breath but the conduct prohibited was in terms of alcohol in the blood. This created a problem because the ratio between the blood alcohol concentration and the breath alcohol concentration (breath) varies from person to person.* For most of the population, this ratio is 2100:1 or greater, but for a small percentage of the population, the ratio is smaller. For those individuals with a ratio less than 2100:1, the Intoxilyzer 5000 overstates the blood alcohol content when it multiplies the alcohol/breath concentration by 2100.

*The need to convert alcohol in the breath to alcohol in the blood can be eliminated by stating the prohibition in terms of alcohol in the breath as well as alcohol in the blood.* Prior to 1997, 38 of the 50 states had done so by adopting a standard to include grams of alcohol per 210 liters of breath as well as grams of alcohol per 100 milliliters of blood. Typically, the statutes in those states prohibit operation of a vehicle with .10 grams of alcohol in 210 liters of breath which is the equivalent to a .10% blood alcohol content.

(emphases added). The trial court determined that Indiana's amended version of

Indiana Code Section 9–30–5–1 differs from per se intoxication statutes in other states because our legislature included the language "operates a vehicle with at least ten-hundredths *percent (.10%) of alcohol by weight* in grams ...." (emphasis added). Instead, to be consistent with other states, the statute should read as follows: A person who operates a vehicle with .10 grams of alcohol in (a) 100 milliliters of blood, or (b) 210 liters of breath commits a Class C misdemeanor. The court concluded that when a person has the same *weight* of alcohol in his blood and breath, i.e., .10 grams in 100 milliliters of blood and .10 grams in 210 liters of breath, it is physically and medically impossible for that person to have the same *percentage,* i.e., .10% of alcohol both in his blood and breath. Given the 2100 to 1 ratio between the amount of alcohol in a person's blood and breath, a conviction under the breath-alcohol provision, as written, would require that the person have a lethal dose of alcohol in his blood. Thus, the trial court dismissed Count III, the charge against Sales which was based on the breath-alcohol provision.

The State argues that the trial court's reasoning is equivalent to the argument presented by several defendants in a recent Florida Court of Appeals case, *State v. Brigham,* 694 So.2d 793 (Fl.Ct.App.1997). The statute at issue in *Brigham* prohibited the operation of a vehicle with a "blood or breath alcohol level of 0.08 percent or higher." FLA. STAT. § 316.193(1)(b). The defendants in that case argued that given the common definition of "percent," an Intoxilyzer 5000 result of .227 grams of alcohol in 210 liters of breath equates to a breath alcohol percent of only 0.000108, which is far less than the .08 percent required to be convicted under the Florida statute. *Id.* at 794.

The Florida Court of Appeals rejected the defendants' argument for three reasons. First, the court determined that the mathematical calculations presented by the defendants were flawed to the extent that their calculations assumed that the *weight* of alcohol could be equated to its *volume* in order to arrive at a "percent." Specifically, the court noted that this weight-to-volume ratio is not a mathematical percentage because it mixes units of measurement, weight and volume.

Second, the court decided that application of the common and ordinary definition of "percent" would result in an absurd interpretation of the statute, one that was clearly not intended by the Florida legislature. Third, the court considered *in pari materia* Florida's implied consent law, which provides that "the percent of alcohol in the blood shall be based upon grams of alcohol per 100 milliliters of blood when analyzing blood, or upon grams of alcohol per 210 liters of breath when analyzing breath." FLA. STAT. § 316.1932(10)(b). The *Brigham* court concluded that it was more reasonable to rely on the implied consent statute's definition of "percent," which equates blood alcohol and breath alcohol percentages, than on the common definition. *Id.* at 796–97.

Here, as in *Brigham,* the State contends that our legislature could not have intended to require proof of more alcohol concentration than physically and medically possible in order to violate the provision and that the trial court's order violates the rule of construction that a statutory provision should not be construed to reach an absurd result. The State argues further that Indiana Code Section 9–30–5–1 is a technical statute and that the term "percent" has its own scientific definition when used to denote the amount of alcohol in a person's blood or breath.

Sales counters that unlike in *Brigham,* the Indiana Code provides no definition of "percent" to be considered *in pari materia* with the breath-alcohol provision. Sales also argues that the undefined term "percent" as used in the statute is clear and unambiguous and, thus, that we must give the term its plain and ordinary meaning. When the plain meaning of the term "percent" is applied, Sales asserts that Indiana Code Section 9–30–5–1(a)(2) fails because to have .10% by weight of alcohol in 210 liters of a person's breath requires that the person have a lethal dose of alcohol in his blood.

 Our primary concern in construing any statute is to ascertain the intent of the legislature. *Taylor v. State,* 663 N.E.2d 213, 216 (Ind.Ct.App.1996), *trans. denied.* We construe statutes, however, only where there is some ambiguity or vagueness which re-

quires construction. *Grody v. State*, 257 Ind. 651, 659, 278 N.E.2d 280, 285 (1972). The plain meaning of the statute, if it has one, must be given effect. *Id.* Our supreme court has stated that "[i]t is not within the province of this Court to expand or contract the meaning of a statute by reading into it language which will, in the opinion of the Court, correct any supposed omissions or defects therein." *Id.* at 659–660, 278 N.E.2d at 285.

A majority of the states have amended their operating while intoxicated statutes in such a way that the prohibited conduct is now expressed in terms of the number of *grams* of alcohol in the blood and the breath. *See* ALA.CODE § 32–5A–194(a)(5) (percent by weight of alcohol in the blood shall be based upon grams of alcohol per 100 cubic centimeters of blood or grams of alcohol per 210 liters of breath); ALASKA STAT. § 28.35.030(a)(2) (a person commits the crime of driving while intoxicated if the person operates a vehicle when there is 0.10 grams or more of alcohol per 210 liters of the person's breath); CAL. VEHICLE CODE § 23152(b) (it is unlawful for any person to operate a vehicle with 0.08 percent or more, by weight, of alcohol in her blood; "percent by weight" is based upon grams of alcohol per 100 milliliters of blood or grams of alcohol per 210 liters of breath ); FLA. STAT. ANN. § 316.1932(b) (breath-alcohol level must be based upon grams of alcohol per 210 liters of breath); IDAHO CODE § 18–8002A(1)(a) and (4) (it is unlawful to drive a vehicle with an alcohol concentration of 0.08, which is defined as 0.08 grams of alcohol per 210 liters of breath).

Like other states, our legislature amended Indiana Code Section 9–30–5–1 in 1997 to include a provision which expresses the prohibited conduct in terms of the amount of alcohol in a person's breath. Still, Indiana Code Section 9–30–5–1 differs from the statutes in other states in two ways. First, in describing the prohibited conduct, Indiana Code Section 9–30–5–1 includes both of the following phrases: (a) percent by weight of alcohol and (b) in grams in 210 liters of breath. Second, and more importantly, the Indiana Code contains no corresponding definition of "percent" which explains how "percent by weight of alcohol" relates either to 100 milliliters of blood or to 210 liters of breath.

The term "percent" is unambiguous. Thus, we must apply the plain, ordinary and usual meaning of the word. *See* IND.CODE § 1–1–4–1(1). The plain, ordinary and usual meaning of "percent" is "out of each hundred; per hundred." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1343 (3d ed.1992). As written, to be convicted under the breath-alcohol provision a person must have .10% by weight of alcohol in grams in 210 liters of his breath. To express the weight of alcohol as a percentage of 210 liters of breath, we would divide the weight in grams of alcohol by 210, then multiply by 100 to obtain a "percentage."

For example, Sales' printout reported .14 grams of alcohol per 210 liters of breath. To convert that number into a "percentage," we would divide .14 by 210 and then multiply by 100, which is .06%. Under a "literal" application of the provision, Sales had only a percentage of .06, which is well below the percent prohibited by the statute.[9]

■ Still, as we have noted, the State contends that under the rules of statutory construction, we must construe the statute so as to prevent an absurd result. We construe statutes to prevent absurdity and to give effect to the legislature's probable intent. *Anderson v. State*, 649 N.E.2d 1060, 1063 (Ind.Ct.App.1995). However, as we have already stated, when words in a statute are unambiguous, a court must apply the plain and obvious meaning and not resort to other rules of construction. *In Matter of Grissom*, 587 N.E.2d 114, 116 (Ind.1992). Indiana Code Section 9–30–5–1 is not ambiguous and,

---

9. The defect in subsection (a)(2) originates in the word "percent." Subsection (a)(1), however, suffers no similar defect because grams per 100 milliliters of blood does not require a conversion to reach a "percentage." For example, when the same calculation is applied to .14 grams of alcohol in 100 milliliters of blood as that applied to .14 grams in 210 liters of breath, we would divide .14 by 100 and then multiply by 100, which yields the same result as multiplying by one.

thus, we cannot construe the statute to avoid an absurd result.

The State further contends that Indiana Code Section 9–30–5–1 is a technical statute and that "percent," when used in the context of blood or breath-alcohol content, has a unique and scientific meaning. The State relies on Indiana Code Section 1–1–4–1(1), which states that "technical words and phrases having a peculiar and appropriate meaning in law shall be understood according to their technical import." The State also directs us to *Zoercher v. Indiana Assoc. Telephone Co.,* 211 Ind. 447, 7 N.E.2d 282 (1937), and *Woerner v. City of Indianapolis,* 242 Ind. 253, 177 N.E.2d 34 (1961), *cert. denied,* 368 U.S. 989, 82 S.Ct. 605, 7 L.Ed.2d 526 (1962), both of which support the State's assertion that a court may overlook mistakes or defects in construing a statute when the legislative intent is clear.

However, this court has held that in the absence of some legislative expression that words in a statute are to be given a technical meaning, we shall give words their plain, ordinary and usual meanings. *Indiana State Highway Comm'n v. Ziliak,* 428 N.E.2d 275, 279 (Ind.Ct.App.1981). There is no indication in either Indiana Code Section 9–30–5–1 or elsewhere that the word "percent" is to be given a technical or scientific meaning. Therefore, we must apply the plain, ordinary and usual meaning of "percent."

The doctrine of separation of powers would be violated were courts permitted to substitute their judgment for that rendered by the legislature. *See* IND. CONST. art. 3, § 1 (government divided into three separate departments); *see also Rassi v. Trunkline Gas Co.,* 262 Ind. 1, 8, 240 N.E.2d 49, 53 (1968). It follows that absent a clear indication from the legislature, we may not salvage and rewrite a provision, even when it suffers from an obvious defect. We conclude that Indiana Code Section 9–30–5–1(a)(2) is defective on its face and will not support a conviction. We affirm the trial court's order dismissing Count III of the State's information.

## CONCLUSION

In sum, the trial court did not abuse its discretion when it denied Sales' motion to suppress the results of his breath test. We hold that Intoxilyzer 5000 printouts which report the amount of alcohol in 210 liters of a person's breath are not necessarily inadmissible absent a separate challenge to the reliability or accuracy of the test or machine itself.

In addition, we affirm the trial court's *sua sponte* dismissal of Count III. We hold that the breath-alcohol provision is defective and that the State, in order to obtain a conviction under Indiana Code Section 9–30–5–1, must prove beyond a reasonable doubt that the person charged with the crime operated a vehicle with at least .10% by weight of alcohol in grams in 100 milliliters of the person's blood.

In practical terms, our holdings today mean that in its prosecution of Sales, the State can present the Intoxilyzer 5000 printout as evidence to prove that Sales violated Indiana Code Section 9–30–5–2 and 9–30–5–1(a)(1), the two remaining charges. In so doing, however, the State will be required to present evidence to correlate the amount of alcohol in 210 liters of a person's breath, as reported on the printout, with the amount of alcohol in 100 milliliters of blood, an element of Indiana Code Section 9–30–5–1(a)(1).

Affirmed.

GARRARD, J., and KIRSCH, J., concur.